| | | |
|---|---|---|
| KEVIN D. CANTRELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 C 3041 |
| | ) | |
| MICHAEL M. RUMMAN, Director, | ) | Judge Ruben Castillo |
| Department of Central Management | ) | |
| Services; JERRY ADAMS, Building | ) | |
| Manager, James R. Thompson Center; | ) | |
| JENNIFER HALEY, Special Events | ) | |
| Director, James R. Thompson Center; | ) | |
| and JOHN DOES I through V, as | ) | |
| members of the Department of Central | ) | |
| Management Services Police; in their | ) | |
| official and individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case presents difficult questions regarding the limits that state officials can place on

an individual's ability to engage in protected speech on government property. Kevin D. Cantrell

seeks a permanent injunction to restrain Michael M. Rumman, Jerry Adams, Jennifer Haley, and

members of the Department of Central Management Services Police for the James R. Thompson

Center ("Defendants") from enforcing Illinois Administrative Code regulations and Department

of Central Management Services practices that Cantrell claims violate his constitutional right to

engage in expressive activities at the James R. Thompson Center.[1]  (R.7-1, Pl.'s Mot. at 1.)

Cantrell challenges portions of the Illinois Administrative Code both on their face and as applied

---

[1]On June 23, 2004, this Court converted Cantrell's motion for a preliminary injunction
into a motion for a permanent injunction. (R. 11.) Defendant Governor Rod Blagojevich was
dismissed from this lawsuit by stipulation of the parties on September 8, 2004. (R. 21.)

to him.  (R. 1, Compl. at 14.)

## RELEVANT FACTS[2]

### A.    Background

The James R. Thompson Center ("Thompson Center") is a multipurpose government

building bounded by Randolph, LaSalle, Clark, and Lake Streets in downtown Chicago.  *See* 20

ILL. COMP. STAT. 405/405-315.  The Thompson Center is home to state agency offices and

commercial tenants.  *Id.*  Illinois's Department of Central Management Services ("CMS") is

authorized by state statute to manage, operate, maintain, and preserve public buildings, including

the Thompson Center.  *Id.*  The Illinois Administrative Code allows CMS to "establish standards

and criteria for leased space and space assignment" at the Thompson Center.  ILL. ADMIN. CODE

tit. 44, § 5000.110 (2004).

Cantrell is a member of an organization called the Kingdom Heir Ministry who wishes to

discuss his religious beliefs with passersby at the Thompson Center.  (R. 7, Pl.'s Mem. at 1; R.

17, Defs.' Resp. at 3 & Ex. 1A.)  Cantrell states, and Defendants do not question, that he has a

"sincerely held religious belief that he can have an eternal impact on the lives of those who pass

him" at the Thompson Center.  (R. 7, Pl.'s Mem. at 1.)  As a result, on various occasions

beginning in October 2002 Cantrell attempted to share his faith by speaking to passersby,

distributing religious leaflets, and occasionally displaying an easel with a religious message at the

Thompson Center.  (R. 1, Compl. ¶¶ 20-21; R. 19, Cantrell Aff. ¶ 1.)  Cantrell attempted to

engage in these activities in the outdoor plaza immediately abutting the entrance and perimeter of

---

[2]We have gleaned the facts set forth herein from the parties' briefs, exhibits, and
affidavits.  The parties appear to agree on all of the relevant material facts, although there is one
factual dispute that ultimately is not relevant to our resolution of this motion.  *See* note 3, *infra*.

2

the Thompson Center ("Outdoor Plaza") and wishes to engage in these activities in the ground-floor atrium lobby of the Thompson Center ("Atrium") as well. (R. 19, Cantrell Aff. ¶¶ 1-3, 12.)

**B.    Cantrell's Application to Leaflet at the Thompson Center**

In October 2002, a CMS official told Cantrell that he could not engage in expressive activity in the Outdoor Plaza without CMS's written permission. (*Id.* ¶ 1.) Cantrell then went to the CMS office, where the Special Events Director, Jennifer Haley, confirmed that while he could leaflet from the sidewalk surrounding the Thompson Center, he must obtain written permission to engage in expressive activity in the Outdoor Plaza or Atrium. (*Id.* ¶¶ 2-3; R. 17, Defs.' Resp. Ex. 1, Haley Aff. ¶ 4.) Haley gave Cantrell a special events form to complete. (*Id.* ¶ 3.) Cantrell submitted several applications to hold a special event in the Outdoor Plaza, but he insisted that he had a right to engage in his desired activities without specifying a date and he did not pay a fee, both of which are required by the regulations governing special events.[3] (R. 17, Defs.' Resp. Ex. 1, Haley Aff. ¶¶ 11-13.)

On January 13, 2003, CMS informed Cantrell that his first special events application had been denied because he had not provided a complete driver's license number. (*Id.* ¶ 11.) After Cantrell supplied that information, his application was again rejected because he did not specify a date or the area of the Thompson Center that he wished to use. (*Id.*) Cantrell submitted his third special events application in October 2003, in which he identified the dates of October 28

---

[3]There is a factual dispute regarding whether Haley informed Cantrell that he could apply for permission to hold a demonstration at the Thompson Center free of charge. (R. 17, Defs.' Resp. Ex. 1, Haley Aff. ¶ 5; R. 19, Cantrell Aff. ¶ 5.) Cantrell does not challenge the regulations governing demonstrations, and so it is unnecessary to resolve that factual dispute to rule on the present motion.

through December 31 as his preferred use dates.[4]  (*Id.* ¶ 12.)  CMS denied that application because it failed to provide a specific date.  (*Id.*)  Later that month, Cantrell sent CMS a fax stating in relevant part: "I am hoping to pass out gospel tracks tomorrow, October 28[th], from 2:00 pm, to 4:30 pm in the plaza area in front of the Thompson Center." (*Id.* ¶ 13 & Ex. A.)  A handwritten note on that fax indicates that Cantrell's request was denied because he refused to pay the $300 special events fee.  (*Id.*; *see also* R. 7, Pl.'s Mem. at 17-18.)  Cantrell never received written permission from CMS to engage in his speech activities at the Thompson Center.

During the same time that Cantrell was attempting to gain CMS's permission to leaflet, several other non-profit organizations received approval to hold special events at the Thompson Center.  The Mental Health Association in Illinois held a special event in the Outdoor Plaza on September 3, 2003, for which it paid a $300 fee. (R. 17, Defs.' Resp. Ex. 1, Haley Aff. ¶ 14.) The American Lung Association of Metropolitan held a special event in the Atrium on November 5, 2003, for which it paid a $125 fee.  (*Id.* ¶ 17.)  The Hyles-Anderson College held a Christmas concert in the Outdoor Plaza but it "did not pay a fee because groups wishing to perform and provide entertainment are not charged a fee.  They are given space if it is available." (*Id.* ¶ 19.)  The Counsel for a Parliament of the World's Religions held a conference on November 16, 2003 in several parts of the Thompson Center for which it paid a fee of $2,400. (*Id.* ¶ 20.)

---

[4]Cantrell told the Special Events Director that he could only provide a range of dates for his activities because he was employed as an airline pilot and often had to travel without advance notice.  (R. 19, Cantrell Aff. ¶ 8.)

## C. Challenged Regulations

Cantrell seeks an injunction preventing Defendants from enforcing two regulations which fall under the section of Illinois's Administrative Code governing the use and maintenance of state office buildings, including the Thompson Center. ILL. ADMIN. CODE tit. 44, §§ 5000.900-5000.970. Cantrell challenges sections 5000.950 ("Exhibit Regulation") and 5000.960 ("Leafleting Regulation") that require him to seek a permit before leafleting or setting up an exhibit at the Thompson Center. Specifically, Cantrell challenges the following three subsections of the Leafleting Regulation:

A. Section 5000.960(a): "No organization, including charitable organizations and political parties or candidates shall distribute leaflets to, register voters, obtain signatures or solicit and collect funds from persons entering or in the buildings specified in Section 5000.900, except from public sidewalks."

B. Section 50000.960(c): "Activities included in subsection (a) of this Section shall not be allowed without the written permission of the Department."

C. Section 5000.960(f): "The organization must provide a sign 12" by 12" posted at the table, identifying the organization and that there is no affiliation with the State of Illinois. Each person engaged in activities approved by the Department must wear a badge containing the individual and organization names. The organization and its members agree they will not approach, harass, or attempt to compel the public in any activity approved by the Department under subsection (a) of this Section. They also agree to stay in the area designated by the Department and shall not interfere with the business being conducted at the building. The organization and its members shall not engage in any partisan activity, nor shall they advocate for a political party, candidate or issue. No material shall be distributed by the organization, unless granted a demonstration permit pursuant to Section 5000.940. Deviations from the requirements of this subparagraph must be approved in advance of the activity by the Department. Failure to follow the rules may result in the organization being removed from the premises and permission being denied to continue the activity."

(R. 7, Pl.'s Mem. at 3.) Cantrell challenges the following two subsections of the Exhibit Regulation:

A.  Section 5000.950(b): "Special events and exhibits at the buildings may be requested up to two years in advance of the date for the special event or exhibits. Requests must be in writing and submitted to the Special Events Office or Building Manager. All requests for special events and exhibits will be filled on a first-come first-served basis. A letter of confirmation or rejection will be issued within 10 working days."

B.  Section 5000.950(c): "The areas available for Special Events at the [Thompson Center] are the concourse level, atrium level, assembly hall, outdoor plaza and covered arcade, conference/hearing rooms and agency office areas with permission of the agency. Exhibits are allowed only in the atrium lobby level of the [Thompson Center] unless permission is granted to use another part of the building by the Department. Exhibits may not promote religious philosophies or political candidates or philosophies."

(*Id.*) Cantrell challenges each of these regulations as unconstitutional both on their face and as applied to him. (R. 1, Compl. ¶ 14.)

## LEGAL STANDARDS

A permanent injunction "is not a remedy which issues as of course . . . or to restrain an act the injurious consequences of which are merely trifling." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982) (quotations omitted). In determining whether to grant permanent injunctive relief, this Court must consider four factors: (1) whether Cantrell has succeeded on the merits; (2) whether Cantrell has an adequate remedy at law or will be irreparably harmed if denied the injunction; (3) whether the injury to Cantrell is greater than the harm the injunction will inflict on Defendants; and (4) whether granting the injunction will harm the public interest. *Plummer v. Am. Inst. of Certified Pub. Accountants*, 97 F.3d 220, 229 (7th Cir. 1996). Cantrell's burden in demonstrating that he is entitled to a permanent injunction is particularly high because a permanent injunction is not provisional or temporary in nature, but rather stands as a final judgment. *See id.*

## ANALYSIS

## I.    Preliminary Issues

Defendants raise two initial matters in their response to Cantrell's motion for a permanent injunction which we will address prior to turning to the core substantive dispute.[5] First, Defendants argue that Cantrell has no claim against them in their individual capacities because state officials can be sued in their official capacities for "prospective injunctive relief but not retroactive monetary relief." (R. 17, Defs.' Resp. at 6.) Defendants' two sentence argument is—in essence—that they are immune from suit in federal court for retroactive monetary relief in their individual capacities. (*Id.*) That assertion is incorrect. While it is true that the Eleventh Amendment confers immunity upon state officers from federal suit in their official capacity, that immunity does not apply to state officials who act in their individual capacities. *Ameritech Corp. v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002). Because individual capacity suits seek recovery from the defendant personally, "individual capacity suits do not implicate the Eleventh Amendment's protections, making an exception to Eleventh Amendment immunity obviously unnecessary." *Id.* While we will not dismiss the individual capacity claims against Defendants, we will consider whether Defendants are entitled to qualified immunity from liability in their individual capacity after we consider Cantrell's constitutional claims.

Second, Defendants argue that Jerry Adams, the Thompson Center's Building Manager, should be dismissed because Cantrell has not alleged that Adams had direct involvement in the

---

[5]Cantrell argues that it is improper for Defendants to raise these matters outside of a motion to dismiss. (R. 20, Pl.'s Reply at 13.) While we agree that it is unusual to proceed in this fashion, Cantrell has cited no rule to prevent us from considering the arguments raised in Defendants' response.

alleged conduct.[6] (R. 17, Defs.' Resp. at 6-7.) As Cantrell points out on reply, however, Defendants' own briefing implicates Adams in the conduct at issue here. Defendants state that the building manager approved Cantrell's permit application to hold a special event. (*Id.* at 4.) Defendants have not contested Cantrell's identification of Adams as the Thompson Center's building manager. As a result, we decline to dismiss Adams from this suit at this point in the litigation.

## II.     Success on the Merits

In order to prevail on his motion for a permanent injunction, Cantrell must first successfully demonstrate that the Leafleting and Exhibit Regulations are invalid either on their face or as applied to him. *See Plummer*, 97 F.3d at 229. Cantrell has launched a multi-front attack on the challenged regulations, arguing that they violate his free speech, substantive due process, equal protection, and free exercise rights, as well as the Illinois Religious Freedom Restoration Act. Because we find that the Leafleting and Exhibit Regulations violate the First Amendment, we need not address whether Cantrell has demonstrated success on the remainder of his constitutional and state law arguments.

### A.     First Amendment Claim

Cantrell challenges the Leafleting and Exhibit Regulations on their face and as applied to him, arguing that they violate his rights of freedom of speech and freedom of the press under the First Amendment. (R. 7, Pl.'s Mem. at 4; R. 1, Compl. ¶ 14.) The First Amendment—which applies to state governments under the Fourteenth Amendment—provides that "Congress shall

---

[6]Defendants' argument that Governor Blagojevich should be dismissed from this case is moot given his dismissal from this suit by stipulation of the parties after Defendants filed their response brief. (R. 21.)

8

make no law . . . abridging the freedom of speech, or of the press." U.S. Const. Amend. I; *see also Weinberg v. City of Chi.*, 310 F.3d 1029, 1034 (7th Cir. 2002), *cert. denied*, 540 U.S. 817 (2003). There is no doubt that the content of Cantrell's proposed speech is constitutionally-protected. The Supreme Court has long made clear that private religious speech is at the core of First Amendment protections. As Justice Scalia put it:

> Indeed, in Anglo-American history, at least, government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince. Accordingly, we have not excluded from free-speech protections religious proselytizing . . . or even acts of worship . . . .

*Capital Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). In particular, the Supreme Court has consistently acknowledged the value of leafleting as a means of conveying religious ideas. *See, e.g., Watchtower Bible & Tract Soc'y of N.Y. v. Vill. of Stratton*, 536 U.S. 150, 161-62 (2002). As noted in *Watchtower*, the Supreme Court stated more than sixty years ago that:

> The hand distribution of religious tracts is an age-old form of missionary evangelism—as old as the history of printing presses. It has been a potent force in various religious movements down through the years . . . This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits.

*Murdock v. Penn.*, 319 U.S. 105, 108-109 (1943). Because there is no doubt that Cantrell's speech is protected by the First Amendment, our task is to determine whether the challenged regulations impermissibly infringe upon his right to engage in protected speech.

Cantrell posits several theories from which he argues that the Leafleting and Exhibit Regulations violate the First Amendment, including that they: 1) constitute illegal prior restraints on speech; 2) constitute impermissible viewpoint and content-based restrictions; 3) place

9

unfettered discretion in the hands of state officials; 4) fail as time, place, and manner restrictions; and 5) provide insufficient procedures through which to appeal permit denials. (R. 7, Pl.'s Mem. at ii.) Defendants insist that the regulations are content-neutral time, place, and manner restrictions that are narrowly tailored to further compelling state interests. (R. 17, Defs.' Resp. at 11-15.) The parties' briefing charts a winding course through First Amendment principles—and to their credit, separating the competing interests and obligations here is not a simple endeavor. It is important to clarify, however, that there are two distinct analytical routes that apply to permit and licensing requirements like those at issue here.

### 1.    **Proper Analytical Framework**

The Seventh Circuit has rejected the idea that all licensing schemes that affect speech rights should be analyzed as prior restraints that must be free of vagueness or uncertainty "to pass constitutional muster." *Thomas v. Chicago Park Dist.*, 227 F.3d 921, 923-924 (7th Cir. 2000), *aff'd*, 534 U.S. 316 (2000). Because "the historical referent of 'prior restraints' is censorship," *id.*, the Seventh Circuit has held that permit requirements should only be analyzed under the prior restraint rubric where the permit requirement on its face is concerned with the content of the proposed speech, *MacDonald v. City of Chicago*, 243 F.3d 1021, 1031-32 (7th Cir. 2001). A regulation that leaves too much discretion to officials who approve or deny permits are properly analyzed as prior restraints because they raise the threat that the official will discriminate based on the content or viewpoint of the applicant's proposal. *Id.* at 1030-31; *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988) (noting that the danger of censorship "is at its zenith when the determination of who may speak and who may not is left to an official's unbridled discretion"). Where official discretion or content distinctions are not at

issue, the appropriate approach is to analyze the requirement as a time, place, and manner restriction. *MacDonald*, 243 F.3d at 1031-32.

On their face, the Leafleting Regulations display the two hallmarks of prior restraints: official discretion and content-based distinctions. Subsection (a) of the Leafleting Requirement states that "[n]o organization . . . shall distribute leaflets to . . .persons entering or in [the Thompson Center], except from public sidewalks." ILL. ADM. CODE tit. 44, § 5000.960(a). Subsection (c) amends that exclusion by stating that such leafleting "shall not be allowed without the written permission of" CMS. *Id.* § 5000.960(c). The only application criteria in the Leafleting Regulations state that the request to leaflet must be in writing and list the name of the organization, as well as the time and beginning and ending dates of the activity. *Id.* § 5000.960(e). The Leafleting Regulations are devoid on their face of any other criteria to guide CMS officials in determining whether to extend written permission. Additionally, whether leafleting is allowed under the Leafleting Regulations turns on the content of the proposed advocacy. The Leafleting Regulations prohibit leafleters from engaging in "any partisan activity" or advocating "for a political party, candidate or issue." *Id.* § 5000.960(f). Because the Leafleting Regulations are concerned with the content of the proposed speech, we cannot treat them as mere time, place, and manner restrictions. *MacDonald*, 243 F.3d at 1031-32.

On their face, the Exhibit Regulations do not suffer from the same discretion problem found in the Leafleting Regulations. The language of the Exhibit Regulations is mandatory: "[a]ll requests for special events and exhibits will be filled on a first-come first-served basis." *Id.* § 5000.950(b). The mandatory nature of the word "will" indicates that the government official must grant a permit unless there is a scheduling conflict. Although official discretion appears to

11

be sufficiently limited by the face of the Exhibit Regulations, they nonetheless carve out an exception based on the content of the proposed speech. Subsection (c) prohibits permits for any exhibits that "promote religious philosophies or political candidates or philosophies." *Id.* § 5000.950(c). The first requirement of a time, place, and manner restriction is that the regulation must be content neutral. *Ward v. Rock Against Racism*, 491 U.S. 781, 799-99 (1989); *see also Carreon v. Ill. Dep't of Human Servs.*, __ F.3d __, No. 03-4117, 2005 WL 120509, *7 (7th Cir. Jan. 21, 2005). As a result, we will also subject the Exhibit Regulations to scrutiny as a prior restraint. *See MacDonald*, 243 F.3d at 1031-32.

## 2. Prior Restraint Analysis

As discussed above, the Leafleting and Exhibit Regulations are properly analyzed as prior restraints on speech. A prior restraint exists where a statute gives "public officials the power to deny use of a forum in advance of actual expression" and where officials use that power to prevent someone "the use of public places to say what they want[] to say." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). Thus a prior restraint exists where approval of a permit application for speech activities is "not a matter of routine; instead, it involve[s] the appraisal of facts, the exercise of judgment, and the formation of an opinion." *Id.* at 554 (internal quotation omitted). Although prior restraints are "highly disfavored," they are not *per se* unconstitutional. *Weinberg*, 310 F.3d at 1045. To withstand First Amendment scrutiny, a permitting scheme must contain "narrowly drawn, reasonable, and definite" standards that prevent the exercise of "limitless discretion" by state officials in determining what expression is allowed. *Niemotko v. Maryland*, 340 U.S. 268, 271-72 (1951); *see also Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 132-33 (1992).

12

### a.    Unfettered Discretion

We must first determine whether the lack of guidance tethering official discretion dooms the Leafleting Regulations under the First Amendment. "It is well established that where a statute or ordinance vests the government with virtually unlimited authority to grant or deny a permit, that law violates the First Amendment's guarantee of free speech." *MacDonald*, 243 F.3d at 1026. The doctrine prohibiting unbridled discretion "requires that the limits [the defendant] claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *City of Lakewood*, 486 U.S. at 770. Express limits are necessary because society "cannot presume that officials will act in good faith and follow standards not explicitly contained in the ordinance." *Weinberg*, 310 F.3d at 1046.

There is no explicit, textual criteria in the Leafleting Regulations to limit CMS's discretion in granting or denying a leafleting permit. The Leafleting Regulation simply states that activities including leafleting "shall not be allowed without the written permission of [CMS]." ILL. ADM. CODE tit. 44, § 5000.960(c). There is nothing in the remaining subsections of the Leafleting Regulations to prevent CMS from gauging the perceived desirability of the proposed speech in considering whether to issue a leafleting permit. *See, e.g., Weinberg*, 310 F.3d at 1046. Moreover, subsection (f) explicitly grants CMS officials substantial discretion in approving the type of leafleting activity, stating that "[d]eviations from the requirements of this subparagraph must be approved in advance of the activity by [CMS]." ILL. ADM. CODE tit. 44, § 5000.960(f). The Leafleting Regulations thus allow CMS officials to deviate from, for example, the requirement that leafleters refrain from "advocat[ing] for a political party, candidate or issue"

13

but they provide no explanation in the subsection to direct CMS officials as to how or when they should make those departures.

Though Defendants insist that they "have not exercised such discretion," (R. 17, Defs.' Resp. at 12), they point to nothing in the text of the Leafleting Regulation that limits the potential for abuse of discretion. We cannot simply accept Defendants' word that they never exercise discretion in reviewing leafleting applications. *Weinberg*, 310 F.3d at 1046. Defendants also argue that leafleters can avoid the leafleting permission requirements by applying for a demonstration permit, (R. 17, Defs.' Resp. at 14; *see also* ILL. ADM. CODE tit. 44, Section 5000.940), but that is not clear from the face of the Leafleting Regulations.[7] It is not our role to write limits into an otherwise silent state statute. *City of Lakewood*, 486 U.S. at 770. As a result, we find that on their face the Leafleting Regulations violate the First Amendment by vesting unlimited discretion in CMS officials to make leafleting permit decisions.

While nothing on the face of the Exhibit Regulations suggests that CMS officials have unfettered discretion in approving or denying special event and exhibit permits, we note that the submitted evidence suggests that CMS exercised substantial discretion in applying those regulations. First, it is unclear why CMS repeatedly directed Cantrell to apply for a special event

---

[7]Although Defendants have not argued that Section 5000.960(f) facially subjects leafleters to the criteria for demonstrations under Section 5000.940, we note that the Leafleting Regulations state that "No material shall be distributed by the organization, unless granted a demonstration permit pursuant to Section 5000.940." ILL. ADM. CODE tit. 44, § 5000.960(f). We cannot assume that the term "material" as used in this subsection includes leaflets, because to do so would render superfluous the separate requirements codified in subsections (a) through (e) that apply with specificity to those who wish to distribute leaflets. *See Matter of Lifshultz Fast Freight Corp.*, 63 F.3d 621, 628 (7th Cir. 1995) (noting the Court's "deep reluctance" to interpret any statutory provision in a way that renders another superfluous). The only way to reconcile the term "materials" as used in subsection (f) with the remainder of the section's requirements is to read that term to mean materials other than leaflets.

permit under the Exhibit Regulations, when the code defines "special event" as "an activity involving a non-state entity . . . [which] takes place after normal business hours or on weekends or holidays." ILL. ADM. CODE tit. 44, § 5000.910. Defendants have submitted evidence demonstrating that Cantrell wished to engage in his speech activities on weekdays during business hours. (R. 17, Defs.' Resp. Ex. 1, Haley Aff. ¶¶ 12-13 & Ex. A.) CMS officials thus departed from the Code's definition of "special event" in directing Cantrell to apply for a special event application. Additionally, CMS officials appear to have some level of discretion in deciding whether to waive the special event fee. Haley averred that while most non-profits are charged a fee for holding a special event, that fee was waved for a Hyles-Anderson College Christmas concert on the Outdoor Plaza. (R. 17, Defs.' Resp. Ex. 1, Haley Aff. ¶ 19.) The college "did not pay a fee because groups wishing to perform and provide entertainment are not charged a fee. They are given space if it is available." (*Id.*) Haley neither cited any regulation codifying that exception nor explained how she distinguishes a "performance" or "entertainment" from other forms of expressive activity. Despite the evidence indicating that CMS officials exercised discretion in applying the Exhibit Regulations, we do not find that on their face the Exhibit Regulations allow an unconstitutional level of official discretion because the text of those regulations limit official discretion. *See City of Lakewood*, 486 U.S. at 759-60, 770.

**b.     Ban on Approaching the Public**

Cantrell also argues that the Leafleting Regulations' ban on leafleters' ability to approach the public operates as an unconstitutional prior restraint. (R. 7, Pl.'s Mem. at 10.) The Leafleting Regulations require organizations that receive permission to leaflet to agree that they will not "approach, harass, or attempt to compel the public" in connection with their leafleting

15

activities. ILL. ADM. CODE tit. 44, § 5000.960(f). Even though the Leafleting Regulations do not act as a complete ban on leafleting activities at the Thompson Center, subsection (f) operates as a ban on leafleters' ability to distribute their leaflets in the typical manner of approaching citizens and handing them leaflets as they pass by.

In *Hill v. Colorado*, the Supreme Court considered whether an ordinance which prevented any person outside a health care facility from "knowingly approach[ing] another person within eight feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill . . ." was an unconstitutional prior restraint on speech. 530 U.S. 703, 707 n.1 (2000). In upholding the ordinance, the Supreme Court specifically relied on the fact that the speaker was only prevented from approaching an individual if that individual did not consent to the approach. *Id.* at 734-35. The Court acknowledged that "[p]rivate citizens have always retained the power to decide for themselves what they wish to read, and within limits, what oral messages they want to consider." *Id.* at 734. Because the ordinance empowered the private citizen to decide whether to receive the speaker's message, the Court found that the ordinance did not implicate the prior restraint concerns that arise when government officials are given the power to decide whether a private citizen receives a message. *Id.* As a result, it found that the ordinance did not constitute an unconstitutional prior restraint. *Id.* at 735.

In this case, the Leafleting Regulations prohibit organizations and its members from approaching the public in connection with their leafleting activities regardless of whether the targeted individual consents to being approached. On their face, the Leafleting Regulations ban a leafleter from approaching a member of the public unless CMS approves a "deviation" in advance of the activity. ILL. ADM. CODE tit. 44, § 5000.960(f). The decision about whether or

not a leafleter may approach members of the public is thus squarely given to government officials. Unlike the ordinance approved by the Supreme Court in *Hill*, the Leafleting Regulations do not provide any exception for private citizens who consent to being approached by a leafleter. Thus, this ordinance raises concerns regarding official censorship because it allows government officials to decide which leafleters can approach the public and provides no guidelines for how that decision should be made. As a result, we find that the Leafleting Regulations constitute an unconstitutional prior restraint to the extent that they provide no exception to the "no-approach rule" in cases where citizens consent to being approached.

### c.     Content-Based Restrictions

Cantrell also argues that the challenged regulations make content-based distinctions in violation of the First Amendment. (R. 7, Pl.'s Mem. at 13.) The Leafleting and Exhibit Regulations both contain prohibitions that are based on the content of the proposed speech. ILL. ADM. CODE tit. 44, §§ 5000.960(f), 5000.940(c). Organizations that are granted permission to leaflet are still not permitted to "engage in any partisan activity, nor shall they advocate for a political party, candidate or issue." *Id.* § 5000.960(f). Similarly, the Exhibit Regulations on their face prohibit permits for exhibits that "promote religious philosophies or political candidates or philosophies." *Id.* § 5000.950(c). Both regulations thus rule out use of the Thompson Center for those who wish to leaflet as a means of advocating for political issues or for those who—like Cantrell—wish to display an exhibit that promotes a religious philosophy. Because the government has determined that these whole categories of speech are off-limits to leafleters or those holding special events, the challenged regulations must overcome the First Amendment's hostility toward content-based regulations. *Boos v. Barry*, 485 U.S. 312, 319 (1988).

Not all content-based restrictions are invalid and the level of scrutiny that we will apply to the Leafleting and Exhibit Regulations depends on the nature of the fora at issue. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). The Supreme Court has traditionally identified three forum types: the traditional public forum, the designated public forum, and the non-public forum. *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678-79 (1992) . A traditional public forum exists where property has, "by long tradition or by government fiat" been "devoted to assembly and debate." *Perry*, 460 U.S. at 45. Designated public fora exist where the government—by purposeful government action—has opened a place for public expression. *Id.* at 45-46; *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). A non-public forum is one "which is not by tradition or designation a forum for public communication[.]" *Perry*, 460 U.S. at 46. The Supreme Court has also recognized a fourth category of public forum: the limited public forum. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001). Limited fora exist where the government opens a space only "for certain groups or for the discussion of certain topics" in order to confine the forum "to the limited and legitimate purposes for which it was created." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

The relevant fora in this case are the Outdoor Plaza and the Atrium of the Thompson Center. Cantrell argues that the Outdoor Plaza constitutes a traditional public forum and that the Atrium constitutes a designated public forum. (R. 7, Pl.'s Mem. at 6-7.) Defendants assert "that the areas available for rent to the public, the outdoor plaza, concourse level, atrium level, assembly hall, outdoor plaza, and conference rooms [of the Thompson Center], constitute limited public fora, whereby the strict scrutiny standard applies." (R. 17, Defs.' Resp. at 10.)

Defendants also refer to the fora at issue, however, as designated public fora. (*Id.* at 15.) What guides our analysis is that Defendants concede that they have opened up both the Outdoor Plaza and Atrium for the public to use for speech purposes and that strict scrutiny applies to restrictions on speech in those fora. (*Id.* at 10-11.) Based on this concession, and because the evidence shows that Defendants have opened up the Outdoor Plaza and Atrium to a variety of forms of public speech, (*see* R. 17, Def.'s Resp. Ex. 1, Haley Aff. ¶¶ 14-21), we will analyze the Outdoor Plaza and Atrium as designated public fora. *See Perry*, 460 U.S. at 45.

In a designated public forum, "the government may only enforce content-based exclusions of speech if there is a showing that the restriction is necessary to serve a compelling state interest and if the exclusions are narrowly drawn to achieve that end." *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of Chi.*, 45 F.3d 1144, 1151 (7th Cir. 1995) (citing *Perry*, 460 U.S. at 45-46). Defendants have identified the following compelling interests in support of the Leafleting and Exhibit Regulations: maintaining the orderly movement of the crowd, protecting the safety and convenience of people using the Thompson Center, avoiding scheduling conflicts, and maintaining the safety and security of the public. (R. 17, Defs.' Resp. at 13.) The Defendants argue that their interest in ensuring the safe and continuous flow of traffic includes keeping the doorways clear, keeping the floors clear of debris and clutter, and maintaining order to prevent the disruption of business. (*Id.*) We agree that the identified interests are compelling state interests. *See, e.g., Madsen v. Women's Health Center*, 512 U.S. 753, 768 (1994) (noting that the state "has a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks . . ."); *Weinberg*, 310 F.3d at 1038 (noting that the government's "interest in maintaining the flow of pedestrian traffic is intertwined with the

concern for public safety"); *MacDonald*, 243 F.3d at 1034 (stating that "the organized, effective, and safe flow of traffic" is a "significant government interest").

Having stated a compelling interest in controlling access to the Thompson Center, to survive strict scrutiny Defendants must demonstrate that the Leafleting and Exhibit Regulations are narrowly tailored in furtherance of the cited interests. *Perry*, 460 U.S. at 45-46. Defendants argue that the challenged regulations are sufficiently tailored because they do not constitute an outright ban on the activities that Cantrell wishes to conduct and because "[r]equiring would-be demonstrators to notify CMS of the date and time of their activity and granting permission to use the [Thompson Center] facilities on a first-come, first-served basis allows the state to maintain safety and order without infringing on the Constitutional rights of the public." (R. 17, Defs.' Resp. at 15.) While we recognize that the challenged regulations' advance notice requirements may be necessary to prevent groups of speakers from inundating the limited space of the Thompson Center, Defendants have not explained how the content restrictions in the challenged regulations further their cited interests.

Defendants ignore the fact that on their face the challenged regulations ban whole categories of speech: the Leafleting Regulations ban advocacy "for a political party, candidate or issue, " ILL. ADM. CODE tit. 44, Section 5000.960(f), and the Exhibit Regulations ban exhibits that "promote religious philosophies or political candidates or philosophies," *id.* at Section 5000.950(c). Instead of explaining why these content-based exclusions are necessary, Defendants insist that the Illinois Administrative Code is content neutral when read in its entirety. (R. 17, Defs.' Resp. at 12.) In support of this argument, Defendants cite Section 5000.930 of the code, which outlines "prohibited activities" at the Thompson Center and other

20

state buildings. *Id.* Specifically, Defendants argue that the code is content-neutral because subsection (f) of the prohibited activities section states that "[n]o displays or structures . . . in the building or on the grounds may be erected without the written permission of [CMS] pursuant to Section 5000.940" and then states that such permission will only be granted if the "display structure is part of symbolic expression in the exercise of free speech guaranteed by the First Amendment . . . ." ILL. ADM. CODE tit. 44, § 5000.930.

We fail to see how Section 5000.930 erases the content distinctions made in the Leafleting and Exhibit Regulations. First, subsection 5000.930(f) applies only to "displays or structures" rather than leafleting activities, and so it does nothing to alter the Leafleting Regulations' ban on political advocacy. Second, Defendants' argument suggests that the Exhibit Regulations' religious prohibition is nullified by the rule in the "prohibited activities" section that only allows displays that are "symbolic expression in the exercise of free speech . . ." Defendants' reading of the code thus violates the cannon of statutory construction that prevents reading a statute in a way that renders any of its terms superfluous. *See Matter of Lifshultz Fast Freight Corp.*, 63 F.3d at 628. Finally, even if Sections 5000.930 and 5000.950 are read together compatibly, nothing in subsection 5000.930(f) mandates the inclusion of all display structures that are part of "symbolic expression in the exercise of free speech." Instead, subsection 5000.930(f) states that permission to erect displays or structures will *only* be granted if they meet the "symbolic expression" qualification. Conceivably, a proposed display could meet this criteria and therefore avoid being labeled a "prohibited activity" under Section 5000.930, but nonetheless be excluded when analyzed under the Exhibit Regulation if it is found to promote a religious philosophy. As a result, we cannot credit Defendants' argument that the

21

code is content-neutral when viewed in its entirety.

Defendants have made no argument—and we can think of none—to explain why the particular categories of speech targeted in the Leafleting and Exhibit Regulations must be excluded to promote its stated interests in traffic flow or public safety. They have not suggested that political leaflets are more likely to cause passersby to stop and linger than non-political leaflets or that religious exhibits are more likely to draw crowds of on-lookers than non-religious ones. These content-based restrictions seem even less justifiable given their inconsistency; it is difficult to imagine why a ban on religious philosophies in exhibits is needed to promote the stated interests but the same particular ban is not required for leafleting activity. Given Defendants' lack of explanation for these categorical exclusions, we cannot find that the Leafleting or Exhibit Regulations are reasonably tailored, let alone narrowly tailored, to further the cited state interests. As a result, we find that the challenged regulations fail as content-based restrictions on speech in violation of the First Amendment.[8] *See, Airline Pilots Ass'n*, 45 F.3d at 1151.

---

[8] Cantrell has also argued that Defendants engaged in viewpoint discrimination by denying his special event application while approving other groups' applications. (R. 7, Pl.'s Mem. at 15.) Viewpoint discrimination exists where a speaker is denied access to a forum "solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). Defendants have shown, however, that Cantrell's special events application was denied because of his refusal to specify a date for his speech activities and his refusal to pay the required fee. (R. 17, Defs.' Resp. Ex. 1, Haley Aff. ¶¶ 8, 11-13 & Ex. A.) Cantrell has introduced no evidence to show that other groups with a different viewpoint on the subject of religion were approved without specifying a date. Although the Hyles-Anderson College was allowed to give a Christmas concert free of charge, Cantrell has not rebutted Defendants' evidence that CMS waived the fee because of the form of the speech—namely, a performance—rather than the espoused viewpoint. We cannot find, therefore, that Cantrell's failure to secure a special events permit was solely the result of a desire to suppress his point of view. *See Cornelius*, 473 U.S. at 806.

22

### d. Narrow Tailoring as Applied to Cantrell

We also find that the challenged regulations are insufficiently tailored to meet

Defendants' cited interests as they were applied to him as an individual speaker. The Supreme

Court has a long history of protecting the right of individual speakers to engage in leafleting

activity in the face of government attempts to ban that activity outright. *See, e.g., Int'l Soc'y for*

*Krishna Consciousness, Inc.,* 505 U.S. at 692; *Bd. of Airport Comm'rs of Los Angeles v. Jews for*

*Jesus, Inc.,* 482 U.S. 569 (1987); *U.S. v. Grace,* 461 U.S. 171 (1983). The Supreme Court has

also shown hostility toward permit requirements for licensing activity when those requirements

are applied to an individual speaker. In *Watchtower,* for example, the Supreme Court struck

down a village ordinance requiring a permit for door-to-door canvassing as insufficiently tailored

to the Village's interests of preventing fraud, protecting citizens' privacy, and preventing crime.

536 U.S. at 168. The Court found that:

> It is offensive—not only to the values protected by the First Amendment, but to the
> very notion of a free society—that in the context of everyday public discourse a
> citizen must first inform the government of her desire to speak to her neighbors and
> then obtain a permit to do so. Even if the issuance of permits . . . is a ministerial task
> that is performed promptly and at no cost to the applicant, a law requiring a permit
> to engage in such speech constitutes a dramatic departure from our national heritage
> and constitutional tradition.

*Id.* at 165-66. Because the ordinance corralled religious and political speech into the same arena

as commercial speech the Court found it was not sufficiently tailored to address the

government's interest in preventing fraud. *Id.* at 168. Additionally, the Court found that the

presence of a permit was unlikely to reduce privacy invasions or criminal activity and thus was

insufficiently tailored to protect those interests. *Id.* at 168-69. In voiding the village canvassing

ordinance, the *Watchtower* Court highlighted its concern that permit requirements for leafleting

prevent "a significant amount of spontaneous speech. *Id.* at 167-68.

In a recent analogous case, the Sixth Circuit invalidated a state permitting scheme as applied to an individual leafleter at the Ohio state capital grounds. *Parks v. Finan*, 385 F.3d 694 (6th Cir. 2004). The ordinance made the capital grounds:

> available for use by the public for the purpose of governmental business, public meetings for free discussion of public questions, or for activities of a broad public purpose, provided the authorized procedure has been followed and appropriate approvals have been received . . .

*Id.* at 701. The Sixth Circuit found that this requirement was overly-broad as applied to an individual wearing a sandwich board and passing out leaflets on the capital grounds. *Id.* The Court echoed the *Watchtower* Court's concern regarding the stifling of spontaneous speech, stating that the "permit fee and bureaucratic formalities involved in obtaining a permit are likely to chill casual speakers who would otherwise make statements on Capital Square but find that the benefit of expression is far outweighed by the expense of applying for a permit." *Id.* at 702. In addition, the Court found that, as applied to an individual leafleter, the ordinance was insufficiently tailored to further the government's cited interest in protecting the condition of the grounds, ensuring public safety, and ensuring permitted speakers are able to engage effectively in expressive activity. *Id.* at 703. The Court noted that, "[p]articular types of individual activity that might cause damage, endanger public safety, or interfere with other speakers, can be governed just as effectively, if not more so, by regulations prohibiting or limiting such actions directly . . . ." *Id.*

Defendants have not demonstrated that an individual leafleter like Cantrell poses any threat to its stated interests. The Supreme Court has acknowledged that leafleting—as opposed

24

to soliciting—is a relatively unobtrusive form of speech. *Int'l Soc'y for Krishna Consciousness*, 505 U.S. at 690. The threat to traffic flow that an individual leafleter poses is limited because passersby need not stop to mechanically take a leaflet from someone's hand and the recipient need not stop on the spot to read or consider the leaflet. *Id.* Indeed, the Supreme Court found that "it is difficult to point to any problems intrinsic to the act of leafleting that would make it naturally incompatible with a large, multipurpose forum . . . ." *Id.* Thus, even in an indoor, multipurpose space there is little reason to believe that an individual leafleter like Cantrell poses a significant threat to crowd flow, use of the center, or public safety.

In making this determination, we are cognizant that the relevant fora here—the Outdoor Plaza and Atrium of the Thompson Center—are markedly different from those in *Watchtower* and *Parks*. The Thompson Center is a large, multi-purpose forum that is home to government offices as well as commercial tenants. While the Outdoor Plaza is perhaps akin to the capital grounds at issue in *Parks*, the Atrium is located inside the Thompson Center where government and commercial business is conducted. We recognize that in a situation where a large number of individual leafleters all arrived in the Atrium or Outdoor Plaza at a single time, as a collective the leafleters could pose a real threat to the Defendants' compelling interests in ensuring the safe and efficient flow of traffic at the Thompson Center. Defendants have offered no evidence, however, that such a scenario has ever played out at the Thompson Center. More importantly, Defendants have not argued that Cantrell was hampering traffic flow, disrupting business, or creating a public safety hazard when the challenged regulations were applied to him. Thus we cannot find that the Leafleting and Exhibit Regulations as applied to Cantrell were narrowly tailored to effectuate Defendants' stated goals.

Moreover, many of the overbreadth concerns underlying the *Watchtower* and *Parks* decisions are present in this case when we consider how the challenged regulations were applied to Cantrell. Cantrell's permit application was denied because he did not wish to specify a date for his speech or pay the required $300 fee. (R. 17, Defs.' Resp. Ex. 1, Haley Aff. ¶¶ 8, 11-13 & Ex. A.) The bureaucratic formalities of the application process coupled with the expense of applying for a permit in this case chilled Cantrell's ability to speak in a relatively spontaneous manner. Even when Cantrell specified a date, his application was denied for failure to provide the fee. (*Id.* at Ex. A.) Charging a fee for the distribution of leaflets burdens Cantrell's ability to speak at all, let alone spontaneously. *See Watchtower,* 536 U.S. at 165-66 (noting that even permit applications for leafleting that are approved with no cost are in tension with our nation's free speech heritage). Given the relative innocuousness of Cantrell's proposed speech activities, we cannot find that the permit requirement that CMS applied to Cantrell was narrowly tailored to further the government's cited interests. That policy placed a substantial burden on Cantrell's ability to leaflet at the Thompson Center in any capacity.

Because we have found that the Leafleting and Exhibit Regulations violate the First Amendment on their face and as applied to Cantrell, there is no need for us to consider Cantrell's arguments that these regulations violate his substantive due process, equal protection, and free exercise rights, or the Illinois Religious Freedom Restoration Act. Instead, we will proceed to the second prong of the permanent injunction test.

## III.    Irreparable Harm

Having found that Cantrell has successfully shown that the Leafleting and Exhibit Regulations violate the First Amendment, we must next determine whether Cantrell has shown

that he will suffer irreparable harm for which there is no adequate remedy at law unless we grant the permanent injunction. *Plummer*, 97 F.3d 229. In most cases, "[e]ven a temporary deprivation of first amendment freedom of expression rights is generally sufficient to prove irreparable harm." *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990). Irreparable harm is not enough to justify the issuance of a permanent injunction, however. Cantrell must also demonstrate that he has no adequate remedy at law. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (stating that "[t]he absence of an adequate remedy at law is a precondition to any form of equitable relief"); *see also Weinberger*, 456 U.S. at 312 (noting that "[t]he Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies").

In this case, Defendants have argued that the "Demonstration" section of the Illinois Administrative Code provides an adequate remedy at law to redress Cantrell's harm under the Leafleting and Exhibit Regulations. *See* ILL. ADM. CODE tit. 44, § 5000.940. Defendants have submitted evidence that Cantrell could conduct his desired speech activities in the Outdoor Plaza and Atrium free of charge by applying under the Demonstration section of the code and that the subject matter of his activities would not be considered in CMS's review of that application. *Id.*; *see also* R. 17, Defs.' Resp. Ex. 1, Haley Aff. ¶¶ 5, 7. Most importantly, Cantrell stated in his reply brief that if he had known about the option to apply for a demonstration, "he would have welcomed the news as a chance to finally engage in expression in the Outdoor Plaza and ground floor Atrium lobby." (R. 20, Pl.'s Reply at 2-3, n.2.) Although this admission seems to contradict Cantrell's argument that he should never be required to get permission before leafleting at the Thompson Center, we cannot ignore his acknowledgment that he would be

27

satisfied by applying for a free demonstration.

The burden is on Cantrell as the moving party to demonstrate that each one of the requirements for a permanent injunction is met in this case. *See Plummer*, 97 F.3d at 229. Because Cantrell has effectively admitted that the demonstration application process provides an acceptable route toward his goal of leafleting and speaking to passersby at the Thompson Center, he has failed to meet that burden. A court-imposed permanent injunction that prevents state officials from enforcing state law is an extremely weighty measure. *See Weinberger*, 456 U.S. at 311-12. We cannot enter a permanent injunction on Cantrell's behalf to enjoin Defendants from enforcing the Leafleting and Exhibit Regulations where Cantrell has indicated that Illinois law provides an acceptable alternative. Although Cantrell has succeeded on the merits, we must therefore deny his motion for a permanent injunction because Cantrell has not met his burden of showing that he has no adequate remedy at law. If Cantrell finds after pursuing a demonstration permit that this remedy is in fact inadequate, he may again seek relief from the courts. The law of equity, however, simply restricts our ability to grant injunctive relief where Cantrell has acknowledged that an adequate remedy at law exists. *See Roland Mach.*, 749 F.2d at 386.

## IV. Qualified Immunity

Finally, Defendants argue—and we agree—that they are entitled to qualified immunity from damages in this case. The doctrine of qualified immunity exists to ensure that government officers are on notice that their conduct is unlawful before they are subjected to civil liability. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Under this doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

28

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A constitutional right is "clearly established" for purposes of qualified immunity where "a reasonable official would understand that what he is doing violates that right." *Hope*, 536 U.S. at 739.

Cantrell argues that it was sufficiently clear to Defendants that "barring one man from handing out leaflets and talking with people in the Outdoor Plaza violated his rights." (R. 20, Pl.'s Reply at 14.) This argument might have merit if Defendants had acted in the absence of statutory authority. *See Doe v. Heck*, 327 F.3d 492, 516 (7th Cir. 2003). But as the Supreme Court has held, "[t]he enactment of a law forecloses speculation by enforcement officers concerning its constitutionality — with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979); *see also Heck*, 327 F.3d at 516. Relevant to our conclusion that Defendants are entitled to qualified immunity is the fact that Cantrell has not cited any cases in which the Leafleting and Exhibit Regulations have been challenged. *See Heck*, 327 F.3d at 516. Moreover, we have expressly recognized the difficulty in making our determination that the challenged regulations violate the First Amendment given the competing and compelling interests of the government in promoting the safe and convenient use of the Thompson Center. For these reasons, we conclude that a reasonably prudent official acting pursuant to Illinois code regulations would not have understood his or her actions in enforcing the challenged regulations to violate the First Amendment. Defendants are therefore entitled to qualified immunity from damages in this case. *Id.*

29

## CONCLUSION

We grant declaratory judgment in Cantrell's favor as follows:

- 1) Ill. Adm. Code tit. 44, Sections 5000.960(a), (c), and (f) and the Exhibit Regulations, Ill. Adm. Code tit. 44, Sections 5000.950(b) and (c), are unconstitutional as they were applied to Cantrell;

- 2) Ill. Adm. Code tit. 44, Sections 5000.960(a), (c), and (f) are unconstitutional on their face to the extent that (i) they vest unfettered discretion in CMS officials in determining when to issue written permission to leafleters; (ii) they ban leafleters from approaching members of the public without providing an exception in cases where private citizens consent to being approached; and (iii) they prohibit leafleting that "advocate[s] for a political party, candidate or issue"; and

- 3) Ill. Adm. Code tit. 44, Section 5000.950(c) is unconstitutional on its face to the extent that it prohibits displays that "promote religious philosophies or political candidates or philosophies."

Although Cantrell has successfully demonstrated that the Leafleting and Exhibit Regulations violate the First Amendment, Cantrell did not meet his burden of showing that he has no adequate remedy at law. As a result, Cantrell's motion for a permanent injunction is denied. (R. 7-1.) Cantrell is not entitled to nominal damages because Defendants are protected by qualified immunity in this case.

The Clerk of the Court is instructed to enter judgment in favor of Cantrell, pursuant to Federal Rule of Civil Procedure 58.

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

Dated: February 9, 2005

30